Citation Nr: 1536769 
Decision Date: 08/27/15 Archive Date: 09/04/15

DOCKET NO. 12-05 623 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Louisville, Kentucky


THE ISSUES

1. Entitlement to service connection for hypertension, including as secondary to the service-connected posttraumatic stress disorder (PTSD) and type 2 diabetes mellitus (diabetes). 

2. Entitlement to a rating in excess of 30 percent for PTSD. 


REPRESENTATION

Appellant represented by: Non Commissioned Officers Association


WITNESSES AT HEARING ON APPEAL

Appellant and his spouse



ATTORNEY FOR THE BOARD

N. Snyder, Counsel


INTRODUCTION

The Veteran had active service from March 1964 to January 1967.

This appeal comes before the Board of Veterans' Appeals (Board) from an October 2011 decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Louisville, Kentucky. The Veteran and his spouse testified at a videoconference hearing before the undersigned Veterans Law Judge in January 2013. A transcript of the proceeding is of record. 

When the case was before the Board in October 2014, it was decided in part and remanded in part. 

The record before the Board consists of the Veteran's electronic records in Virtual VA and the Veterans Benefits Management System. 


FINDINGS OF FACT

1. The Veteran's hypertension was not present until many years after service, is not related to service, and was not caused or permanently worsened by service-connected disabilities.

2. The social and occupational impairment from the Veteran's PTSD most nearly approximates reduced reliability and productivity. 








CONCLUSIONS OF LAW

1. The criteria for service connection for hypertension have not been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1131, 1137 (West 2014); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.310 (2015). 

2. The criteria for a 50 percent rating, but no higher, for PTSD have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.7, 4.130, Diagnostic Code 9411 (2015). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), codified in pertinent part at 38 U.S.C.A. §§ 5103, 5103A (West 2014), and the pertinent implementing regulation, codified at 38 C.F.R. § 3.159 (2015), provide that VA will assist a claimant in obtaining evidence necessary to substantiate a claim but is not required to provide assistance to a claimant if there is no reasonable possibility that such assistance would aid in substantiating the claim. 

They also require VA to notify the claimant and the claimant's representative, if any, of any information, and any medical or lay evidence, not previously provided to the Secretary that is necessary to substantiate the claim. As part of the notice, VA is to specifically inform the claimant and the claimant's representative, if any, of which portion, if any, of the evidence is to be provided by the claimant and which part, if any, VA will attempt to obtain on behalf of the claimant. 

The Board also notes the United States Court of Appeals for Veterans Claims (Court) has held that the plain language of 38 U.S.C.A. § 5103(a) (West 2014), requires that notice to a claimant pursuant to the VCAA be provided 'at the time' that or 'immediately after' VA receives a complete or substantially complete application for VA-administered benefits. Pelegrini v. Principi, 18 Vet. App. 112, 119 (2004). The timing requirement enunciated in Pelegrini applies equally to the initial-disability-rating and effective-date elements of a service-connection claim. Dingess v. Nicholson, 19 Vet. App. 473 (2006).

The record reflects that the Veteran was provided all required notice in a letter mailed in April 2011, prior to the initial adjudication of the claims. 

The record also reflects that all available service records, VA treatment records, and post-service medical evidence identified by the Veteran have been obtained. Neither the Veteran nor his representative has identified any outstanding, existing evidence that could be obtained to substantiate either of the claims; the Board is also unaware of any such evidence. The Veteran was provided examinations to determine whether the hypertension is related to service or a service-connected disability and the Board finds each opinion is adequate. In this regard, the Board notes that in addition to examining the Veteran, the examiners reviewed the Veteran's pertinent history and properly supported each opinion provided. The Veteran was also provided examinations to determine the nature and severity of the psychiatric disability, most recently in 2015. The Veteran has not alleged that the condition has increased significantly in severity since the examination or that the examination was otherwise inadequate. 

Accordingly, the Board will address the merits of the appellant's claims. 

II. Burden of Proof

Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits under laws administered by the Secretary. The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary. When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107 (West 2014); 38 C.F.R. § 3.102 (2015); see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). 

To deny a claim on its merits, the evidence must preponderate against the claim. Alemany v. Brown, 9 Vet. App. 518, 519 (1996), citing Gilbert, 1 Vet. App. at 54.

III. Service Connection

A. Legal Criteria

Service connection may be established for disability resulting from disease or injury incurred in or aggravated by active military, naval, or air service. 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303. 

Where a veteran served for at least 90 days during a period of war or after December 31, 1946, and manifests hypertension to a degree of 10 percent within one year from the date of termination of such service, such disease shall be presumed to have been incurred or aggravated in service, even though there is no evidence of such disease during the period of service. 38 U.S.C.A. §§ 1101, 1112; 38 C.F.R. §§ 3.307, 3.309. 

For the showing of chronic disease in service, there is required a combination of manifestations sufficient to identify the disease entity, and sufficient observation to establish chronicity at the time, as opposed to merely isolated findings or a diagnosis including the word "chronic." When the fact of chronicity in service (or during any applicable presumptive period) is not adequately supported, then a showing of continuity after discharge is required to support the claim. 38 C.F.R. § 3.303(b). The term "chronic disease" refers to those diseases, such as hypertension, listed under section 1101(3) of the statute and section 3.309(a) of VA regulations. 38 U.S.C.A. § 1101(3); 38 C.F.R. § 3.309(a); Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). 

Service connection may be granted for any disease initially diagnosed after discharge, when all the evidence, including that pertinent to service, establishes the disease was incurred in service. 38 C.F.R. § 3.303(d). 

A disability which is proximately due to or the result of a service-connected disease or injury shall be service connected. 38 C.F.R. § 3.310(a) 

Any increase in severity of a nonservice-connected disease or injury that is proximately due to or the result of a service-connected disease or injury, and not due to the natural progress of the nonservice-connected disease, will be service connected. However, VA will not concede that a nonservice-connected disease or injury was aggravated by a service-connected disease or injury unless the baseline level of severity of the nonservice-connected disease or injury is established by medical evidence created before the onset of aggravation or by the earliest medical evidence created at any time between the onset of aggravation and the receipt of medical evidence establishing the current level of severity of the nonservice-connected disease or injury. 38 C.F.R. § 3.310(b). 

B. Factual Background and Analysis

Service treatment records do not show that the Veteran was diagnosed with hypertension, and there is no post-service medical evidence suggesting that it was present until many years following the Veteran's discharge from service.

A January 2006 VA initial visit record reveals the Veteran's history of borderline hypertension. After evaluation, hypertension was diagnosed. 

A June 2009 VA examination record reveals the Veteran's history of hypertension since 2005, concurrent with the prescription of medication for his service-connected diabetes. After examination and review of the record, the examiner diagnosed hypertension. The examiner opined that the hypertension was not caused or aggravated by the service-connected diabetes. The examiner noted that the Veteran was determined to have no complication of diabetes in February 2006 and that there was no evidence of renal disease. The examiner explained that type II diabetes without renal disease is not a well-documented cause of hypertension. 

A February 2013 Disability Benefits Questionnaire reveals a treating VA medical professional's determination that the Veteran had hypertension due to high anxiety from PTSD. 

A February 2015 VA hypertension examination record reveals a diagnosis of essential hypertension. The examiner noted that the currently accepted etiologies of essential hypertension are age, obesity, family history, race, diet, alcohol consumption, and physical inactivity. The examiner determined the hypertension was less likely than not incurred in or caused by service, explaining that there was no medical evidence supporting a diagnosis of elevated blood pressure, borderline hypertension, or hypertension during service or within one year of service. The examiner noted that hypertension was not diagnosed until 38 years after discharge from service. 

The examiner also found the hypertension was not caused by the service-connected diabetes. The examiner explained that hypertension resulting from diabetes is directly related to the presence of stage IV renovascular disease, stage 4 diabetic nephropathy, and that the current blood and urine analysis results were normal, with no proteinuria and normal blood urea nitrogen, creatinine, and glomerular filtration rate. The examiner found there was no hypertension related to diabetes given the lack of diabetic renal disease. 

The examiner further found no aggravation of the hypertension by a service-connected disability and no causation of the hypertension by the service-connected PTSD. The examiner explained that the hypertension was well controlled and there was no evidence of an aggravated hypertension condition or a hypertensive urgency or malignant hypertension condition. The examiner added that transient elevation of blood pressure is a foreseeable physiological response to fear, stress, and anxiety, but a sustained elevation of blood pressure is not. The examiner reported that there is no medical evidence to establish any additional medication for the hypertension condition had been prescribed in direct response to PTSD symptoms or treatment. The examiner added that there was no clinical evidence of aggravation due to diabetes, noting that the hypertension was well controlled and there was no diabetic nephropathy which was the precursor for diabetic hypertension. 

The Board finds service connection is not warranted for hypertension. Initially, the Board finds a preponderance of the evidence shows that hypertension was not present until more than one year after discharge from service. The service treatment and examination records reveal no history or finding suggestive of hypertension, and the initial post-service evidence of hypertension is dated in 2006, 38 years after separation. Additionally, the Veteran has not alleged that he had hypertension within one year after his discharge from service. Furthermore, a VA examiner has provided a probative opinion that the hypertension was not present until more than one year after the Veteran's discharge from service.

The preponderance of the evidence also establishes that the hypertension is unrelated to service. The 2015 VA examiner provided a probative opinion that the hypertension was not due to service. There is no contrary medical opinion of record, and although the Veteran was presumably exposed to herbicides during service, hypertension is not a disease for which service connection is presumed based on that exposure, and there is no medical evidence linking the hypertension to service. 

Finally, the preponderance of the evidence establishes that the hypertension is not secondary to a service-connected disability. VA examiners provided probative opinions that the hypertension was not caused or aggravated by the service-connected diabetes or PTSD. In this regard, the Board notes that the examiners provided rationale for the determinations that the hypertension was not secondary to the PTSD or diabetes. The record includes a DBQ medical opinion linking the hypertension to the service-connected PTSD. The opinion is not supported by a rationale, however, and it is ambiguous as to whether the opinion is indicating a causal or aggravation link between the two conditions. As such, the Board finds the probative value of the opinion is limited and outweighed by the probative value of the VA examiners' opinions against the claim. 

Although the appellant might believe that his hypertension is related to service or is secondary to service-connected PTSD or diabetes, the record does not suggest the appellant, who is a layperson, is competent to determine such a relationship. In any event, the Veteran's lay opinion is less probative than the medical opinions against the claim

Accordingly, the claim must be denied. In reaching this decision, the Board has considered the doctrine of reasonable doubt but has determined that it is not applicable to this claim because the preponderance of the evidence is against the claim.

IV. Increased Rating

A. Legal Criteria

Disability evaluations are determined by the application of a schedule of ratings, which is based on average impairment of earning capacity. 38 U.S.C.A. § 1155; 
38 C.F.R. Part 4. 

The Veteran's psychiatric disability is evaluated under Diagnostic Code 9411, which provides that a 30 percent rating is warranted when there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). 

A 50 percent disability rating is warranted when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short-and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. 

A 70 percent disability rating is warranted when there is occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships. 

A 100 percent evaluation is warranted for total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 

The symptoms listed are not intended to constitute an exhaustive list, but rather serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). 

When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the veteran's capacity for adjustment during periods of remission. The rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126(a). 

In assessing the evidence of record, it is important to note that the Global Assessment of Functioning (GAF) score is based on a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Richard v. Brown, 9 Vet. App. 266, 267 (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th ed. (DSM-IV) at 32). A GAF of 41 to 50 reflect serious symptoms (e.g. suicidal ideation or severe obsessional rituals), or any other serious impairment in social or occupational functioning. A GAF score of 51 to 60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co- workers). A GAF of 61 to 70 is defined as some mild symptoms or some difficulty in social, occupational, or school functioning but generally functioning pretty well, has some meaningful relationships. 

B. Factual Background and Analysis

In accordance with 38 C.F.R. §§ 4.1, 4.2 (2015) and Schafrath v. Derwinski, 1 Vet. App. 589 (1991), the Board has reviewed all evidence of record pertaining to the history of the service-connected disability. The Board has found nothing in the historical record that would lead to the conclusion that the current evidence of record is not adequate for rating purposes. Moreover, the Board is of the opinion that this case presents no evidentiary considerations, which would warrant an exposition of remote clinical histories and findings pertaining to the PTSD.

The record reflects the Veteran's endorsement of symptoms and impairment, including sleep impairment, nightmares, anxiety, anxiety attacks, intrusive thoughts, irritability, impairments of memory and concentration, and social isolation. The Veteran has reported that he is good at masking personal emotion. The Veteran is married and reportedly has good relationships with his wife and stepchild. 

VA treatment records reveal findings of normal orientation, appropriate appearance, normal thought process, normal speech, normal memory, normal affect, and normal thought content. Insight and judgment were consistently found to be intact, and attention and concentration were found to be intact except on one occasion in May 2014. The Veteran has reported difficulty being involved with other people, but in October 2010 he reported that he is usually friendly in encounters with new people. The Veteran has generally denied suicidal ideation, though he reported an increase in suicidal thoughts around the holidays due to increased stress in October 2010 and suicidal thoughts without intent in June 2012. The Veteran has denied homicidal ideation or actually harming others and examiners have found no lack of impulse control, but he reported "marked irritability or attempts to suppress anger" and indicated that he may become verbally or physically aggressive when angry. The record reveals negative histories as to hallucination except in May 2014 and no evidence of loss of contact with reality. The records document the assignment of GAF scores of 50 (June 2012), 55 (assessment of highest GAF in past year in June 2012), 65 (November 2011, March and February 2012), and 66 (June 2012). 

An April 2011 VA examination record reveals the Veteran's history of "some general improvement" in his psychiatric symptoms, though he still had anxiety attacks. He reported sleep impairment, nightmares, intrusive thoughts, anxiety attacks, and episodes where he gets "real nervous and cannot be around people." He also reported that loud noises "set [him] off." He reported that he got along really well with his second wife, describing her as his best friend, and his stepdaughter. He indicated that he did not really have a social life, explaining that he stopped going to church because he does not like being around people. He described distrust of people. He reported contact with his in-laws. He denied friends outside of family but reported occasional social get togethers with one of his wife's uncles. He reported occasionally going to restaurants and performance events with his wife. He denied a history of suicide attempts, inappropriate behavior, or violence. He reported good management of anger, though he reported one occasion in the previous month where he had a verbal confrontation with a young man who had unwittingly hit the Veteran's wife. The Veteran explained that the situation made him so upset that he had to leave the place. He reported having panic attacks several times per week. He denied suicidal or homicidal ideation. 

The examination revealed normal speech, thought content, thought process, memory, and affect and intact orientation and attention. After evaluation, the examiner diagnosed PTSD in partial remission. The examiner found the Veteran no longer met the full criteria for PTSD, "probably because the treatment he was on had been effective at reducing some avoidance symptoms." The examiner found the Veteran had mildly impaired psychosocial functioning. The examiner noted that the Veteran had a close relationship with his wife but difficulty making friendships outside of family. The examiner also noted that the Veteran engaged in a few recreational activities but would tolerate occasional social gatherings with anxiety. The examiner determined the PTSD resulted in signs and symptoms that were transient or mild and decrease work efficiency and ability to perform occupational tasks only during periods of significant stress. 

A February 2013 Disability Benefits Questionnaire (DBQ) reveals a diagnosis of PTSD manifested by depressed mood; anxiety; suspiciousness; panic attacks more than one a week; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively; mild memory loss such as forgetting names, directions, or recent events; impairment of short and long-term memory; chronic sleep impairment; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; difficulty adapting to stressful circumstances; and inability to establish and maintain effective relationships. The record notes that the Veteran was isolated and had no friends and was "always" very anxious. The report indicates that the Veteran was not able to deal with more than one or two individuals at a time. The medical professional, a VA nurse practitioner, assigned a GAF score of 58 and determined the PTSD resulted in occupational and social impairment with deficiencies in most areas. 

A February 2015 VA examination record reveals the Veteran reported having a good relationship with his wife, who he described as his "best" and "only" friend. He also reported "some" contact with family and regular contact with his stepdaughter. He reported depressed mood, anxiety, intrusive thoughts, nightmares, feelings of worthlessness, irritability, concentration difficulties, sleep impairment, isolation, panic attacks that occur weekly or less often, and chronic sleep impairment. Examination revealed good hygiene, normal speech, full affect, full orientation, good impulse control, normal thought content, normal attention and concentration, and normal memory. The Veteran denied hallucinations and current suicidal ideation. He reported playing "Russian roulette" every five to six months and indicated that he had pulled the trigger "several" times over the previous three to four years. The examiner diagnosed PTSD with occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily. 

Upon consideration of the evidence, the Board finds a 50 percent rating is warranted based on the evidence of occupational and social impairment with reduced reliability and productivity due to symptoms, notably panic attacks, anxiety, and difficulty with social interactions. A rating in excess of 50 percent is not warranted at any time, however. 

In reaching this determination, the Board acknowledges that the record includes the assignment of a GAF score of 50 in June 2012, which is indicative of serious symptoms or serious impairment in functioning. The record also includes a 2013 DBQ documenting a finding that the psychiatric disability results in deficiencies in most areas. The other GAF scores of record, including that reported in the 2013 DBQ, indicate findings of at most moderate symptoms or impairment, however, and VA examiners have determined the psychiatric disability results in the degree of social and occupational impairment warranting a 30 percent rating. In any event, GAF scores and examiners' assessment of the severity of the condition must be considered in light of the actual symptoms of the Veteran's disorder, which provide the primary basis for the rating assigned 38 C.F.R. § 4.126(a). This is, in part, because the scores and assessments are generally based on the veteran's symptoms that particular day, rather than based on any long-term symptomatology. 

In this case, the Veteran's psychiatric disability was not manifested by impairment more nearly approximating occupational and social impairment with deficiencies in most areas to warrant a 70 percent rating at any point during the period on appeal. Although there is evidence of impairment of mood and social functioning, the Veteran's speech, thought process, orientation, grooming, and ability to function independently has been consistently normal. Although the 2013 DBQ reports that the Veteran's ability to function independently was compromised at times, this finding is inconsistent with the other medical records, which consistently show ability to function independently, and the Board finds the DBQ is less probative than these other findings, particularly because there is no rationale for the DBQ finding. The Veteran has maintained good relationships with his wife and stepdaughter, maintains relationships with some extended family members, and is able to successfully participate in group therapy, even taking on an informal leadership role in the group. See, e.g., February 2012 VA treatment record. Although the record shows one report of hallucination and documents the Veteran's reports of anger and irritability, there is no evidence that the Veteran has posed a risk to others or ever lost contact with reality. The Board also finds the Veteran has not posed a persistent risk of harm to himself. Although the Veteran reported pulling a gun trigger "several" times over four years in 2015, he clarified that he predominantly does not pull the trigger when performing "Russian roulette" and he has consistently denied suicidal intent and generally denied suicidal ideation and has not otherwise reported behavior suggesting a lack of impulse control. Based on the evidence, the Board finds there is no significant impairment of orientation, thinking, speech, or judgment; or persistent impairment of impulse control or suicidal ideation during the period on appeal. 

The Veteran has also not reported significant deficiency in occupational functioning due to the PTSD during the period of the claim, and the medical records do not suggest such impairment. In this regard, the Board notes that the Veteran was reported to be working or volunteering in January 2012 and September 2013 and although he reported difficulty maintaining "odd jobs" in June 2012, he did not report that this was due to the PTSD. Furthermore, although he reported occupational impairment while he was working full-time, the record suggests at least some of the impairment was due to alcohol abuse which has been in remission throughout the period of the claim. 

The Board finds the overall effect of the PTSD most nearly approximates the reduced reliability and productivity contemplated by the 50 percent rating granted herein. In this regard, the Board finds that the findings reported in the treatment records and examination records are more probative than the June 2012 GAF score of 50, the 2013 DBQ assessment, and the Veteran's contentions that his symptoms more nearly approximate the higher rating. 

The Board has considered whether this claim should be referred to the Director of the Compensation Service for extra-schedular consideration. In determining whether a case should be referred for extra-schedular consideration, the Board must compare the level of severity and the symptomatology of the claimant's disability with the established criteria provided in the rating schedule for disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the disability picture is contemplated by the rating schedule, the assigned evaluation is therefore adequate, and no referral for extra-schedular consideration is required. Thun v. Peake, 22 Vet. App. 111, 115 (2008).

In this case, as explained above, the manifestations of the disability and their impact on social and occupational functioning are contemplated by the schedular criteria. Therefore, referral of this claim for extra-schedular consideration is not warranted. 

The Board has also considered whether an inferred claim for a total disability rating based on individual unemployability (TDIU) under Rice v. Shinseki, 22 Vet. App. 447 (2009) has been raised. The Board acknowledges that the Veteran is no longer employed on a full-time basis and that he has been determined to have occupational impairment from his psychiatric disability. He has not alleged that he is unemployable because of his psychiatric disability, however; instead, he has reported that he stopped working due to age. Additionally, although there is evidence of impairment of occupational functioning, there is no probative evidence of inability to maintain or obtain substantially gainful employment due to the psychiatric disability. Therefore, the Board finds that Rice is inapplicable.


 (CONTINUED ON NEXT PAGE)




ORDER

Service connection for hypertension is denied.

A 50 percent rating, but no higher, for PTSD is granted throughout the period of the claim, subject to the criteria applicable to the payment of monetary benefits. 



____________________________________________
Shane A. Durkin
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs